UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J&J Sports Productions, Inc.,

        Plaintiff,

v.                                            Case No. 11-cv-15002

J&J Keynote Lounge, Inc., et al.,        Sean F. Cox
                                                     United States District Court Judge

        Defendants.

_____/

**OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 56 [DOCKET ENTRY NO. 23]**

      Plaintiff J & J Sports Productions, Inc. ("the Plaintiff") is a California corporation that engages in the business of distributing televised sporting events. Defendant, J&J Keynote Lounge, Inc. ("the J & J Keynote Lounge"), is a Michigan Corporation doing business under the name of "Keynote Sports Bar & Lounge," at 18439 Conant, Detroit, Michigan 48234. Defendants Donna Mass and James Mass each own a fifty-percent share of the J & J Keynote Lounge.

      The Plaintiff was granted the exclusive distribution rights for the November 14, 2009, Pacquiao versus Cotto fight ("the Program"). The rate set by the Plaintiff for commercial establishments with between 0 and 100 seats on the night of November 14, 2009, was set at $2,200.00. Neither party disputes that the Program was shown in the J & J Keynote Lounge, and that the Plaintiff never received payment for the commercial rate from the J & J Keynote Lounge.

On November 11, 2011, the Plaintiff filed its Complaint, alleging (1) Violation of Title 47 U.S.C. Section 605; (2) Violation of Title 47 U.S.C. Section 553, and (3) conversion.

On October 12, 2012, the Plaintiff filed "Plaintiff's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56," contending that, as a matter of law, there is no genuine issue of material fact as to whether the Defendants violated 47 U.S.C. § 605(a) in Count 1 of the Complaint. In their motion, the Plaintiff requests $114,197.50 in damages.

In their response to the Plaintiff's summary judgment motion, the Defendants concede that the Program was shown in the J&J Keynote Lounge, but assert that Kenneth Hall, a patron who lives above the J & J Keynote Lounge, without their knowledge or consent, exhibited the Program to its patrons by connecting his DIRECTV satellite box to one of the televisions in the J & J Keynote Lounge.

For the reasons that follow, the Court shall **GRANT** "Plaintiff's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56" [Docket Entry No. 23] with regard to Defendant J&J Keynote Lounge's liability under § 605(a) of the Communication Act.

## BACKGROUND

Sometime around July 28, 2009, the Plaintiff was granted the exclusive nationwide television distribution (closed-circuit) rights to "Fire Power": Manny Pacquiao v. Miguel Cotto, WBO Welterweight Championship Fight Program" telecast nationwide on Saturday, November 14, 2009, including all under-card bouts and fight commentary encompassed in the television broadcast the Program. (Docket Entry No. 1, at 3, ¶ 11; Docket Entry No. 23, at 8; Docket Entry No. 23-5.)

The Plaintiff entered into subsequent sub-licensing agreements with various commercial entities, including entities in Michigan, granting them the rights to publicly exhibit the Program to

its patrons. (Docket Entry No. 1, at 3–4, ¶ 12; Docket Entry No. 23, at 8–9.)

The Plaintiff provides a rate card for commercial establishments to show the Program to its patrons. (Docket Entry No. 23-3, at 9.) The rate card for the Program on the night of November 14, 2009, was set at $2,200.00 for commercial establishments that have between 0 and 100 seats to exhibit the Program to its patrons. (*Id.*)

The Plaintiff alleges that:

> [a]s a commercial distributor of sporting events, including the *Program*, Plaintiff expended substantial monies marketing, advertising, promoting, administering, and transmitting the *Program* to its customers, the aforementioned commercial entities. In an effort to protects it proprietary rights to distribute its purchased programs and to combat piracy, Plaintiff retains investigative agencies, private detectives, and auditors to monitor commercial establishments (i.e., bars, restaurants, casinos, etc.) to detect the unauthorized exhibition of its programming. Plaintiff compiled a confidential list of authorized and legal customers who paid the required commercial license fee to broadcast the *Program* and gave it to private investigators and auditors to ensure only illegal locations were visited by the investigators and auditors.

(Docket Entry No. 23, at 9.) (internal citations omitted).

On the night of Saturday, November 14, 2009, private investigator Wendie Collier allegedly observed the unlawful public exhibition of the Program at the J & J Keynote Lounge. (Docket Entry No. 23-4, at 2.) During her visit, Collier counted approximately forty-five (45) persons at the J & J Keynote Lounge that night. (*Id.*) Collier further asserts that there was a display advertising the Program outside the J & J Keynote Lounge and a ten (10) dollar cover charge was assessed at the door. (*Id.* at 3.)

On November 11, 2011, the Plaintiff filed its Complaint, contending that the Defendants violated 47 U.S.C. §§ 553, 605 for unlawfully exhibiting the fight without paying the commercial rate. (Docket Entry No. 1, at 3–6.) The Plaintiff also brought a separate claim of conversion in the

3

Complaint. (*Id*. at 6–7.)

On January 28, 2012, Defendants filed their Answer. (Docket Entry No. 8.) The Answer asserts that the Defendants' contracted with Comcast Michigan, LLC ("COMCAST") "to . . . display the fight" at the J & J Keynote Lounge. (Docket Entry No. 8, at 3–7, ¶¶ 14, 17–19, 21–24, 26–28.)

On that same day, Defendants also filed a Third-Party Complaint, naming COMCAST as a defendant in furtherance of the defense that they advanced in the Answer. (Docket Entry No. 8, at 11–18.) In the Third-Party Complaint, the Defendants/Third Party Complaint Plaintiffs allege that COMCAST negligently provided them with the Program for a residential fee of $14.99, even though COMCAST knew or should have known that the J & J Keynote Lounge is a commercial establishment and, accordingly, was required to pay the commercial rate. (*Id.* at 13–14, ¶¶ 8–14.) The Complaint also alleges breach of contract based on an alleged oral contract between COMCAST and the Defendants/Third Party Complaint Plaintiffs. (*Id.* at 15–16, ¶¶ 15–21.) In their Third-Party Complaint, the Defendants/Third Party Complaint Plaintiffs assert that they are entitled to damages, as well as indemnification and/or contribution from COMCAST with regard to Plaintiff's claims in the Complaint. (*Id.* at 13, 15–16.)

On May 8, 2012, the Court entered an Order of Dismissal, dismissing with prejudice COMCAST as a party to this action, after the parties stipulated that COMCAST was not the correct party of interest. (Docket Entry No. 15.)

On June 7, 2012, the Defendants filed their Amended Third-Party Complaint, alleging the same claims and naming DIRECT T.V. of Michigan ("DIRECTV") as a defendant. (Docket Entry No. 17.)

On December 7, 2012, the Court entered an Order dismissing DIRECTV with prejudice. (Docket Entry No. 35.)

In the Answers to Interrogatories, question eleven (11) asks the Defendants to identify the make and model of all satellite dishes that were affixed to or controlled by the J & J Keynote Lounge on November 14, 2009. (Docket Entry No. 29-2, at 4.) The Defendants responded, "Hughes Network Systems '24' inch." (*Id.*) Question 13 asks the Defendants to identify the satellite programming provider, as well as the account name, customer account number and subscriber of satellite programing, for the J & J Keynote Lounge on November 14, 2009. (*Id.* at 5.) The Defendants answered as follows: "Direct T.V. Kenneth D. Hall." (*Id.*) An invoice was issued by DIRECTV to Kenneth D. Hall for the service location at 18439 Conant St. Apt. FR2, Detroit, Michigan, 48234-1629. (Docket Entry No. 23-7, at 2.) The invoice reflects a charge of $14.99 for "HBO Monthly." (*Id.*)

On October 12, 2012, the Plaintiff filed its Motion for Summary Judgment, contending that, as a matter of law, there is no genuine issue of material fact as to whether the Defendants violated the Communications Act, 47 U.S.C. § 605(a), for displaying the Program in the J & J Keynote Lounge to its patrons without paying the commercial rate. (Docket Entry No. 23, at 1–2.) In their motion, the Plaintiff requests up to $114,197.50 in damages. (*Id.*)

In their response to the Motion for Summary Judgment, the Defendants make the following argument:

> At the time of the fight at issue, Keynote Sports Bar and Lounge did not have cable or satellite service with any provider, however one of the tenants living above the bar apparently maintained a satellite account with Direct TV. Without the knowledge or consent of Mr. or Mrs. Mass, one of the residents, Kenneth Hall, placed the receiver in the bar to display the fight. While the Plaintiff claims that the Defendants showed

5

> the fight for profit, it should be noted that the Bar did not charge a cover, but rather requires patrons to pay for the cost. The Bar requires all patrons to check their coat as a security measure to prevent weapons from being brought in. Without the knowledge of Defendants, *Fire Power*: *Manny Pacquiao v. Miguel Cotto, WBO Welterweight Championship Fight* (hereinafter referred to as "The Fight") was telecast nationwide on Saturday, November 14, 2009 in the bar. The Defendants did not charge any type of cover or other charge to view the fight, and did not gain any type of financial remuneration from its patrons as a result of the fight being shown. The Bar was no more crowded than on a normal Saturday night. The total capacity for the Bar is 50 people maximum. On the night of The Fight, the maximum head count was approximately 20 patrons, which is normal for any particular Saturday night. The bar made approximately $517.00 in liquor sales and $46.00 in amusements.

(Docket Entry No. 29, at 6.) (internal citations omitted). Included with their response was an affidavit signed by Defendant James Mass, asserting that "he later discovered that the upstairs tenant[, Kenneth Hall,] . . . rigged his Direct TV so that the De La Hoya v. Mayweather, fight could be seen in the Bar. That the tenant, Mr. Hall, is not an employee of the Bar nor is he an agent for the Bar. At no time did the Affiant or any of his employees authorize Mr. Hall to display the fight in the Bar." (*Id.* at 13–14.)

Thus, when considering the Third Party Complaints and Answer to the Interrogatories, it would appear that the Defendants are offering new facts and defenses in their response. Essentially, they are asserting that Kenneth Hall exhibited the Program to its patrons on one of the bar's televisions, which was attached to Hall's DIRECTV satellite box, without the Defendants' knowledge or consent.

In order to address these discrepancies, the Court held a motion hearing on February 7, 2013. Ms. Arlene F. Woods, the attorney representing the Defendant, advised the Court there were several mistakes in the Answer to the Interrogatories and that she failed to properly review that document before submitting it to the Court. She stated that Kenneth Hall, without the knowledge or consent

of the Defendants, exhibited the Program to the J & J Keynote Lounge's patrons by connecting his DIRECTV satellite box to a television in the J & J Keynote Lounge. She contends that there was a bartender and a maintenance man on duty that night. In addition, she asserts that there was no cover charge assessed to the patrons of the bar. Instead, a coat fee was assessed that night. Furthermore, she asserted that the J & J Keynote Lounge's utilizes Hughes Net as its satellite service and/or internet provider, not DIRECTV.

When asked about the Third Party Complaint, Ms. Woods stated that, at the time she filed that Complaint, she was under the impression that the DIRECTV account was in the name of the J & J Keynote Lounge, not Hall. She further advised the Court that, when she determined that the account was, actually, in Kenneth D. Hall's name, she moved to dismiss that action.

The Defendants never sought leave to Amend its Answer or Answer to Interrogatories. Likewise, the Defendants never filed a statement of material facts not in dispute.

Ms. Ann-Marie Lepore, the attorney for the Plaintiff, stated that, regardless of these new facts and arguments, the Plaintiff is still entitled to attorney's fees, costs, and statutory damages for the Defendants' non-wilful violation of § 605(a) under 47 U.S.C. 605(e)(3)(C)(i), (iii).

In order to provide the Plaintiff with an opportunity to address the Defendants' new facts and arguments, as well as Ms. Lepore's assertion, the Court ordered the parties to submit supplemental briefs. (Docket Entry No. 36.)

In an affidavit included in the Defendants' supplemental brief, James Mass' states "While I was not at the bar on the night that Mr. Hall hooked his receiver into the television in the bar . . . . I was . . . advised that some of the patrons agreed to go in with Mr. Hall and order the fight through his Direct TV account. Neither the bar nor anyone working at the bar assisted Mr. Hall in this

7

activity and no one from the bar derived any financial benefit from Mr. Hall bringing his receiver into the bar so that he and the other patrons who wanted to see the fight could do so. I am informed and believe that those patrons who wanted to see the fight paid Mr. Hall." (Docket Entry No. 40 at 20.)

## STANDARD OF REVIEW

Summary judgment is proper where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The Court views the record in the light most favorable to the nonmoving party and all reasonable inferences will be drawn in favor of that party. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). "When the non-moving party fails to make a sufficient showing of an essential element of his [or her] case on which he [or she] bears the burden of proof, the moving parties are entitled to judgment as a matter of law and summary judgment is proper." *Chapman v. UAW Local 1005*, 670 F.3d 677, 680 (6th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2458, 91 L.Ed. 2d 265 (1986)). "The judge does not weigh the evidence and determine the truth of the matter but determines whether there is a genuine issue for trial." *Blackmore*, 390 F.3d at 895 (internal quotations omitted).

## ANALYSIS

**A.     There is No Genuine Issue of Material Fact that Defendant J&J Keynote Lounge Violated 47 U.S.C. § 605(a).**

The Defendants allege that Kenneth Hall, a third party with no employment or other relationship with the J&J Keynote Lounge, hooked up his DIRECTV satellite box to one of the J&J Keynote Lounge's televisions and divulged the Program to the J&J Keynote Lounge's patrons

without the Defendants' knowledge or consent. (Docket Entry No. 29, at 7–9; Docket Entry No. 40, at 5–13.)

The Plaintiff contends that, regardless of Kenneth Hall's alleged involvement in this matter, there is no genuine issue of material fact over whether the Defendants violated of the statute, so that the Court may exercise its discretion in awarding attorney's fees, as well as statutory damages under 47 U.S.C. § 605(e)(3)(C)(i) or damages to a sum of not less than $250 under 47 U.S.C. § 605(e)(3)(C)(iii). (Docket Entry No. 23, at 11–15; Docket Entry No. 39, at 5–9.)

Section 605(a) of the Communication Act provides as follows:

> [N]o person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or public the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception . . . to any person other than the addressee, his agent, or attorney . . . .

47 U.S.C. § 605(a). Title 47 United States Code Section 605(a) applies to satellite transmissions. *United States v. One Macomb Video Cipher II*, 985 F.2d 258, 260 (6th Cir. 1993) ("Enacted prior to the ECPA, § 605 prohibits the unauthorized interception of traditional radio communications and communications transmitted by means of new technologies, including satellite communications."). Subsection (e) provides for private civil enforcement of § 605(a) for any person aggrieved by any violation under 47 U.S.C. § 605(a). 47 U.S.C. § 605(e)(3)(A) ("Any person aggrieved by any violation of subsection (a) of this section . . . may bring a civil action in a United States district court or in any other court of competent jurisdiction."). Furthermore, § 605(e) designates varying penalties and/or damages, depending on whether or not a violation was willful.

In *See Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900 (6th Cir. 2001), the Sixth Circuit provides a test to determine whether a defendant violated § 605(a), which asks: 1) whether

9

the plaintiff had a proprietary interest in the communication, 2) whether the defendant intercepted that communication, and 3) whether the defendant unlawfully divulged the communication to its patrons. *Id.* at 914–17.

Neither party disputes that the Plaintiff had a proprietary/ownership interest in the Program. Thus, the next inquiry is whether the Defendants "intercepted" the Program. For the purposes of § 605(a), an "interception" is a "taking or seizure by the way or before arrival at the destined place." *Id.* at 915 (citing *Goldman v. United States*, 316 U.S. 129, 134, 62 S.Ct. 993, 86 L.Ed. 1322 (1942)).

The Defendants assert that Hall intercepted the Program with his DIRECTV satellite box without their knowledge or consent. "But, the absence of an 'interception' does not get [the Defendants] off the hook of § 605." *Id.* 915–16 (citing *That's Entm't, Inc. v. J.P.T., Inc.*, 843 F.Supp. 995, 999 (D. Maryland Dec. 27, 1993)). Even though *Nat'l Satellite Sports Inc.* addressed the liability of an authorized cable company/intermediary that improperly divulged a communication to several bars in violation of § 605(a), the Sixth Circuit, in that case, relied on *That's Entertainment, Inc.*, which addressed the liability of a hotel and its owner, where the communication was purchased by the owner at a residential rate and divulged to the hotel's patrons. The District of Maryland held as follows:

> Even assuming, as these defendants contend, that there was no 'interception' here because [the bar] was 'authorized' by [the residential distributor] to receive the Event on a pay-per-view basis, defendants still have violated the Act because they clearly were not authorized to then broadcast the Event to the patrons of the commercial establishment such as [the bar] . . . .[T]he first and third sentences of [§ 605] do not . . . require an 'interception' of cable transmission and clearly proscribe the unauthorized divulgence or use of communications which have been 'received' legally for certain purposes.
>     Nor is it relevant under the Act whether defendants' unauthorized acts were wilful or knowing . . . . [The Act] is devoid of any language indicating that the Act is violated only by knowing or willful conduct. Indeed, the civil damages provisions

10

> clearly provide for an award of damages to a plaintiff even if 'the court finds that the violator was not aware and had no reasons to believe that his acts constituted a violation . . . .

*Id.* at 998–1000.

Section 605(a) is a strict liability statute intended to prevent commercial establishments from unlawfully profiting from the unlawful exhibition of these programs. *See J & J Sports Productions, Inc. v. Vega*, No. CIV-10-635-M, 2011 WL 776172, at * 1–2 (W.D. Okla. March 1, 2011), and *Joe Hand Promotions, Inc. v. Easterling*, No. 4:08 CV 1259, 2009 WL 1767579, at * 4–5 (N.D. Ohio. June 22, 2009); *Joe Hand Promotions v. Jorgenson*, No. 12-C-0159, 2013 WL 64629, at 2–4 (E.D. Wis. Jan. 4, 2013); *J & J Sports Prod., Inc. v. Aguilar*, No. CIV-12-467-C, 2013 WL 425034, * 1–2 (W.D. Okla. Feb. 1, 2013); *Joe Hand Promotions, Inc. v. Adame*, 2012 WL 3561367, at * 3–4 (W.D. Tex. Aug. 16, 2012).

The Court finds *J & J Sports Prod., Inc. v. Delgado*, No. 2:10-2517, 2012 WL 371630 (E.D. Cal. Feb. 3, 2012), as persuasive authority in this action. In *Delgado*, Defendant Delgado owned and operated a restaurant, the Super Burrito Tacqueria, with her husband. *Id.* at * 1. While Delgado was not present at the restaurant, her husband, without her knowledge or consent, brought his satellite box into the restaurant and unlawfully displayed a pay-per-view fight to the restaurant's patrons without paying the commercial fee. *Id.* at * 1, 3–4. The Eastern District of California held Delgado liable, even though her husband was responsible for displaying the program to the Super Burrito Tacqueria's customers without her knowledge or consent, holding as follows:

> Defendant further protests that she was unaware that her husband decided to use their home video box at the restaurant to view the Program there. However, as noted above, § 605 is a strict liability statute. If it is later found that defendant acted unknowingly, damages under § 605 may be reduced. *See* 47 U.S.C. § 605(e)(3)(C)(II)(iii). This point is irrelevant, however, for determining liability.

*Id.* at 4.

The Defendants contend that *Delgaldo* is distinguishable because the individual that displayed the fight was Delgado's husband, who is the co-owner of the restaurant. (Docket Entry No. 40, at 8.) There is no indication that Delgado's familiar or business relationship with her husband played any part in the Eastern District of California's decision. Instead, the Court noted that, if it is later determined that she did not knowingly divulge the Program, Delgado's damages may reduced under 47 U.S.C. § 605(e)(3)(C)(II)(iii). *See Delgado*, 2012 WL 371630, at * 4 ; *see also National Satellite Sports, Inc.*, 253 F.3d at 917 ("[W]e believe that Congress enacted the Communication Act and the subsequent amendments thereto to protect the integrity of electronic communications from negligent as well as wilful divulgences . . . . Section 605(e), for example, distinguishes between willful and nonwillful divulgences in the setting of statutory damages."). Thus, applying *Delgado*, there is no genuine issue of material fact that Defendant J&J Keynote Lounge is liable under the Communication Act.

The Defendants rely on *J & J Prod., Inc. v. Schmalz*, 745 F.Supp.2d 844 (S.D. Ohio 2010), for their proposition that a genuine issue of material fact exists with regard to whether the Defendants violated the elements of § 605(a), regardless if it is a strict liability statute. (Docket Entry No. 29, at 8–9.) In *Schmalz*, the court found that a bar owner did not violate 47 U.S.C. § 553(a)(1) when it ordered and paid for a program that the cable operator was not authorized to broadcast. *Id.* at 851. Title 47 Section 553(a)(1) provides in relevant part: "No person shall . . . receive . . . any communications service offered over a cable system, unless specifically authorized to do so by a cable operator . . . ." 47 U.S.C. § 553(a)(1). The court interpreted "unless specifically

authorized to do so by a cable operator" to include cable operators who are not authorized to broadcast a program. *Schmalz*, 745 F.Supp.2d at 850–51.

*Schmalz* is distinguishable because it deals with a different statute with different elements. Likewise, the court in *Schmalz* also relied, in its holding, on the facts that the defendant in that action never misrepresented that it was a commercial establishment and the cable operator was subject to a licensing agreement, which required it to make the defendants aware that it was not authorized to sell such rights. *See Joe Hand Promotions, Inc. v. Phoenix Promotions*, *LLC*, 2012 WL 3025107 (E.D. Mich. Jan. 24, 2012) ("On balance, the court finds the analysis set forth in *Coyne* and *TCOS* more persuasive than that in *Schmalz*."). Both of those facts are not present here.

The Defendants also rely on *J & J Sports Prod., Inc. v. Arturo M. Flores*, *et al*, No. 1:10-cv-02087, 2012 WL 6608915 (E.D. Cal. Dec. 18, 2012). *Flores* dealt with a large swap meet where an individual swap meet vendor displayed a communication in violation of § 605(a). *Id.* at 3. Very few people were present during the exhibition of the communication. *Id.* at 4. There was no advertisements, cover charge, and "hardly, if any, profit . . . was made." *Id.* Likewise, the owners of the swap meet had little supervisory control over the vendors. *Id.* The court held that the defendant swap meet owners, who were people, not corporations, were not directly, vicariously or contributorily liable for their tenants/swap meet vendors' unlawful divulgence of a communication under § 605(a) of the Communication Act, noting that the owners had little control over the swap meet vendors and their patrons. *Id.* at 6–10.

Here, there is no landlord/tenant or vendor type relationship as in *Flores*, instead the Program was displayed on, at least, one of the two televisions in J&J Keynote Lounge. (Docket Entry No. 29-2, at 4; Docket Entry No. 40, at 19.) *Flores* did not indicate that the vendor who exhibited the

13

communication in his allotted swap market space to his or her patrons was not liable under § 605(a) of the Communication Act. Likewise, there is no indication that the J&J Keynote Lounge's employees did not have control over or responsibility for the J&J Keynote Lounge and its patrons, which is a small local bar with two televisions and a 50 person maximum fire code occupancy, unlike the swap market owners in *Flores*. (Docket Entry No. 27-5, at 3; Docket Entry No. Docket Entry No. 29, at 14; Docket Entry No. 40, at 19–21.) Furthermore, there was an advertisement clearly displayed in front of the building, stating "Fight Nite." (Docket Entry No 40, at 21.) According to Ms. Collier's affidavit, the bar was almost filled to capacity when the Program was displayed to the bar's patrons. (Docket Entry No. 23-4, at 2–3; Docket Entry No. 29, at 6.) A cover charge, or "coat fee" as the Defendants call it, was assessed to the bar's patrons. (Docket Entry No. 29, at 6.) The Defendants offer no evidence that any employees on duty that night attempted to stop Hall from exhibiting the Program to the bar's patrons. James Mass alleges that Hall received payment from the patrons for exhibiting the Program in his bar. (Docket Entry No. 40, at 20.) Regardless, the J&J Keynote Lounge clearly profited from the unlawful divulgence of the Program to its patrons in greater customer flow, more "coat fees," and increased consumer spending from the patrons who went to the bar to watch the Program.

**B.    A Genuine Issue of Material Fact Exists as to Whether Defendants Donna Mass and James Mass Violated 47 U.S.C. § 605(a).**

With regard to the individual liability of Donna Mass and James Mass, *Delgaldo* is distinguishable because Defendant Delgado was doing business under the name of Super Burrito Tacqueria. In *Delgado*, the Eastern District of California noted in its holding that:

> Mrs. Delgado, who is sued in her capacity doing business as Super Burrito Taqueria, does not dispute that she, along with her husband, owns and runs Super Burrito

14

> Taqueria. It was her commercial establishment that broadcast the Program without authorization and, having chosen not to organize her business as a corporation or other form that would create a legal identity separate from its owners, she may be held liable for its wrongdoing . . . . She may not, therefore, escape liability merely by stating that she was absent on the particular night in question or did not explicitly authorize the broadcast of the program.

2012 WL 371630, at * 4.

Here, unlike the Super Burrito Tacqueria, the J&J Keynote Lounge is a corporation. The parties do not dispute that in order to hold a corporation's shareholders liable under § 605(a) of the Communication Act, the Plaintiff is required to prove that a defendant shareholder had a right and ability to supervise the violations, and that he or she had strong financial interests in such activities. *See J & J Sports Prod., Inc. v. Ribeiro*, 562 F. Supp.2d 498, 501 (S.D.N.Y. May 29, 2008); *J & J Sports Prod., Inc. v. Arturo M. Flores, et al*, No. 1:10-cv-02087, 2012 WL 6608915, at * 4–11 (E.D. Cal. Dec. 18, 2012); *Joe Hand Promotions*, *Inc*., 2012 WL 3561367, at *4.

Throughout its briefs, the Plaintiff merely repeats that Donna Mass and James Mass, "as the officers, directors, shareholders and/or principles of J&J Keynote Lounge, Inc. d/b/a Keynote Sports Bar & Lounge, is liable to Plaintiff for violating 47 U.S.C. § 605, because they had supervisory responsibility and control over the activities of November 14, 2009 and because they received a financial benefit by not paying the commercial rate." (Docket Entry No. 23, at 13; Docket Entry No. 31, at 6; Docket Entry No. 39, at 8; Docket Entry No. 41, at 6.)

The Plaintiff has not provided any argument that the shareholders had a right and ability to supervise the violations, and that they had any direct financial interests in such activities. Instead, the Plaintiff seems to impute liability on J&J Keynote Lounge's shareholders merely because the Program was shown in the J&J Keynote Lounge. The Plaintiff has not provided any evidence

15

suggesting the type of managerial role Donna Mass and James Mass held at the J&J Keynote Lounge on the night Program was shown or any other night, for that matter. The Court notes that in the Answer to Interrogatories a notation by Donna Mass states "The Defendant does not have any information as the parties have been divorced for a number of years." (Docket Entry No. 39-6, at 4.) Thus, it is unclear what role, if any, Donna Mass plays in the day to day operations of the J&J Keynote Lounge. James Mass clearly plays some type of role in the operation of the J&J Keynote Lounge based on the affidavit testimony that he has provided thus far, but his role is still unclear. (Docket Entry No. 1, at 3, ¶ 8–9; Docket Entry No. 8, at 3, ¶ 8–9.)

Although Donna Mass and James Mass may not escape liability by asserting they were not present on the night that the Program was displayed to their customers, a genuine issue of material fact remains whether they had a right and ability to supervise the violations, as well as an obvious and direct financial interest in the misconduct. *See e.g., Ribeiro*, 562 F. Supp.2d at 501; *J & J Sports Prod., Inc. v. 291 Bar and Lounge, LLC*, 648 F.Supp.2d 469, 473 (E.D. New York Aug. 19, 2009); *Joe Hand Promotions, Inc. v. Maryland Food & Entm't, LLC*, No. CCB-11-3272, 2012 WL 5879127, at *3 (D. Maryland Nov. 19, 2012).

**C.    The Plaintiff Is Entitled to Statutory Damages from Defendant J&J Keynote Lounge.**

In its Motion for Summary Judgment, the Plaintiff elects statutory damages under 47 U.S.C. § 605(e)(3)(C)(i)(II), and requests that the Court, in its discretion, increase the award of damages under the enhanced damages provision in 47 U.S.C. § 605(e)(3)(C)(ii). (Docket Entry No. 23, at 15–20.)

The Defendants assert that, even if the Court were to conclude that they violated 47 U.S.C. § 605(a), the Court should reduce the award to damages to a sum of not less than $250 under 47

U.S.C. § 605(e)(3)(C)(iii).  (Docket Entry No. 29, at 10–11.)

Damages for violations are discussed in 47 U.S.C. § 605(e), which reads as follows:

(e) Penalties; civil actions; remedies; attorney's fees and costs; computation of damages; regulation by State and local authorities . . . .

> (3)(A) Any person aggrieved by any violation of subsection (a) of this section or paragraph (4) of this subsection may bring a civil action in a United States district court or in any other court of competent jurisdiction.
>
> (B) The court–
>
>> (i) may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a) of this section;
>>
>> (ii) may award damages as described in subparagraph (C); and
>>
>> (iii) shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.
>
> (C)(i) Damages awarded by any court under this section shall be computed, at the election of the aggrieved party, in accordance with either of the following subclauses;
>
>> (I) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or
>>
>> (II) the party aggrieved may recover an award of statutory damages for each violation of subsection (a) of this section involved in the action in a sum of not less than $1,000 or more than $10,000, as the court considers just, and for each violation of paragraph (4) of this subsection involved in the action an aggrieved party may recover statutory damages in a sum not less than $10,000, or more than $100,000, as the court considers just.

> (ii) In any case in which the court finds that the violation was committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation of subsection (a) of this section.
>
> (iii) In any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $250.

47 U.S.C. § 605(e)(3)(A)–(C).

For the reasons discussed at the motion hearing, in the previous sections, and in the Order for Supplemental Briefs [Docket Entry No. 36], as well as the responses to that Order, the Court holds that a genuine issue of material facts exists as to whether the Defendants wilfully violated § 605(a) for the purposes of the enhanced damages provision of 47 U.S.C. § 605(e)(3)(C)(ii).

Thus, the only issue that remains is the amount of damages for J&J Keynote Lounge's non-wilful violation. The Court has discretion in awarding statutory damages under 47 U.S.C. § 605(e)(3)(C)(i)(II) or damages to a sum of not less than $250 under 47 U.S.C. § 605(e)(3)(C)(iii).

Damages awarded by the Court under the Communication Act

> 'should take into account the proportionality between the loss suffered by the plaintiff and the profit gained by the defendant.' . . . Facts relevant to this determination include the number of patrons in the establishment at the time the violation occurred, the seating capacity of the establishment, the various rates, including the residential rate, charged by the plaintiff for the viewing of the broadcast, and whether the defendant charged patrons a cover for the viewing or was likely to have obtained significant profits in another manner.

*J & J Sports Prod., Inc. v. Trier*, No. 08-11159-BC, 2009 U.S. Dist. LEXIS 6415, * 3–4 (E.D. Mich. Jan. 29, 2009) (quoting *Ribeiro*, 562 F. Supp.2d at 501).

Based on the documents submitted to the Court, as well as the affidavit testimony, the Court

holds that the Plaintiff is entitled to the full commercial rate to exhibit the Program, $2,200; plus an additional $563, which represents an estimate of the total liquor sales and other amusements on November 14, 2009;[1] and an additional $450, which represents an estimate of the "coat fees" assessed that night.[2] (*See* Docket Entry No. 23-3, at 9; Docket Entry No. 23-4 at 2; Docket Entry No. 29-2, at 3.) Accordingly, the Court holds that the total statutory damages calculation is $3,213.

The evidence submitted to the Court suggests that the J&J Keynote Lounge profited from the unlawful showing of the Program. An advertisement was clearly displayed outside of the establishment. J&J Keynote Lounge's managers and employees on duty that night never attempted to stop the unlawful broadcast or take the advertisement down. Instead, the bar was almost filled to capacity with patrons, who allegedly paid Hall to watch the Program at the bar. Regardless of whether or not Hall profited from this endeavor, the J&J Keynote Lounge clearly received more "coat fees", as well as greater customer flow and consumer spending, as a result of the unlawful broadcast of the Program in the bar.

> **D.     The Plaintiff Is Entitled to Statutory Damages and Attorney's Fees from Defendant J&J Keynote Lounge.**

The Plaintiff also requests attorney's fees and costs under 47 U.S.C. § 605(e)(3)(B)(iii). (Docket Entry No. 23, at 18–19; Docket Entry No. 23-9.)

For the aforementioned reasons, the Court also holds that the Plaintiff is entitled to attorney's

---

[1]The Court reached the total liquor sales and other amusements total by adding the $517 in total liquor sales and $46 in other amusement estimate provided Answer to the Interrogatories. (Docket Entry No. 29-2, at 3.)

[2] The Court reached the "coat fee" total by multiplying the $10 coat fee by the number of patrons (45) that Ms. Collier counted in her affidavit on the night of November 14, 2009. (Docket Entry No. 23-4, at 2–3.)

fees and costs, under 47 U.S.C. § 605(e)(3)(B)(iii) in the amount of $4,197.50 as outlined in Docket Entry 23-9. *See Joe Hand Promotions, Inc. v. Phoenix Promotions LLC, et al*, No. 10-15102, 2012 WL 3025107, at *4 (E.D. Mich. July 24, 2012).

## CONCLUSION AND ORDER

**IT IS ORDERED** that "Plaintiff's Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56" [Docket Entry No. 23] is **GRANTED** with regard to Defendant J&J Keynote Lounge's liability under § 605(a) of the Communication Act;

**IT IS FURTHER ORDERED** that the Plaintiff is entitled to statutory damages in the amount of $3,213 from Defendant J&J Keynote Lounge;

**IT IS FURTHER ORDERED** that the Plaintiff is entitled to attorney's fees in the amount of $4,197.50 from Defendant J&J Keynote Lounge.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: April 23, 2013

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 23, 2013, by electronic and/or ordinary mail.

S/Jennifer McCoy
Case Manager